**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-5910

HUI LIN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

KINROSS GOLD CORPORATION, J. PAUL ROLLINSON, ANDREA SUSAN FREEBOROUGH, CLAUDE J. S. SCHIMPER, and WILLIAM D. DUNFORD

Defendants.

---

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**Demand for Jury Trial**

---

Plaintiff Hui Lin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Kinross Gold Corporation ("Kinross" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Kinross' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Kinross common stock between February 18, 2026, to September 23, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning Kinross' expected attributable production for the fiscal years 2026 through 2028. Defendants' statements included, among other things, repeated claims of confidence of their self-

proclaimed "stable" guidance for production of approximately 2 million gold equivalent ounces ("Au eq. oz.") for each of the three fiscal years.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Kinross' production guidance; notably, that Kinross did not have the necessary resources and/or was otherwise ill equipped to achieve the approximately 2 million Au eq. oz. being projected. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Kinross' securities at artificially inflated prices.

4. On September 23, 2026, Kinross issued an "Operational and Return of Capital Update" mid-quarter. In the release, Kinross announced that both full-year 2026 and 2027 attributable production guidance was being reduced to 1.84 million to 1.86 million Au eq. oz. The Company attributed the results, in significant part, on ore recovery challenges at Round Mountain. Defendants would later disclose these challenges were operational in nature and were likely to stem from dilution caused by the use of oversized tools and machinery in the mining process.

5. Investors and analysts reacted immediately to Kinross' revelation. The price of Kinross' common stock declined dramatically. From a closing market price of $27.62 per share on September 23, 2026, Kinross' stock price fell to $24.42 per share on September 24, 2026, a decline of about 11.5% in the span of just a single day.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Kinross' conducts significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **THE PARTIES**

11. Plaintiff purchased Kinross common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Kinross is attached hereto.

12. Kinross Gold Corporation is a Canadian corporation with its principal executive offices located at 25 York Street, 17th Floor, Toronto, Ontario, Canada M5J 2V5. Kinross' United States subsidiary, Kinross Gold U.S.A., Inc. is located at 5075 S. Syracuse Street, Suite 800, Denver, Colorado, 80237. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "KGC."

13. Defendant J. Paul Rollinson ("Rollinson") was, at all relevant times, the Chief Executive Officer and a Director of Kinross.

14. Defendant Andrea Susan Freeborough ("Freeborough") was, at all relevant times, an Executive Vice President and the Chief Financial Officer of Kinross.

15. Defendant Claude J. S. Schimper ("Schimper") was, at all relevant times until July 29, 2026, an Executive Vice President and the Chief Operating Officer of Kinross. On July 29, 2026, Kinross announced Defendant Schimper would be retiring, but would stay on in an advisory role for the transitional period.

16. Defendant William D. Dunford ("Dunford") was, at all relevant times until his promotion, the Senior Vice President of Technical Services and the Chief Technical Officer of Kinross. Following his promotion in March of 2026, Defendant Dunford was, at all relevant times, an Executive Vice President and the Chief Technical Officer of Kinross.

17. Defendants Rollinson, Freeborough, Schimper, and Dunford are sometimes referred to herein as the "Individual Defendants." Kinross together with the Individual Defendants are referred to herein as the "Defendants."

18. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Kinross' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that

the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19. Kinross is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Kinross under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

21. Kinross is a Canadian gold mining company headquartered in Toronto Ontario with regional offices and mining facilities in the United States and abroad.

22. Pertinently, Kinross operates Round Mountain, an open-pit gold mine in Nye County, Nevada. The Company also operates the Paracatu mine in Brazil, the Tasiast in West Africa, Fort Knox in Alaska, and La Coipa in Chile.

***The Defendants Materially Misled Investors Concerning***

***Kinross' Production Outlooks for Fiscal Year 2026 and 2027***

*February 18, 2026*

23. On February 18, 2026, Kinross published their fourth quarter and full-year results. Pertinently, Kinross additionally confirmed forward guidance for the next three fiscal years of roughly 2 million Au eq. oz.:

> In 2026, Kinross ***expects to produce 2.0 million attributable gold equivalent ounces4 (+/- 5%) from its operations. Production is expected to remain stable at 2.0 million attributable gold equivalent ounces (+/- 5%) for each of 2027 and 2028.***

(Emphasis added).

24. An earnings call was conducted the following morning, on February 19, 2026, during which Defendant Rollinson highlighted the previous year's performance, stating, in pertinent part:

> Looking back, 2025 was another strong year for our business, underpinned by consistent operational and financial performance. We produced just over 2 million ounces and achieved our cost guidance, demonstrating a rigorous focus on cost control. As a result, our margins increased by 66% compared to a 43% increase in the gold price.

25. Elaborating on the discrete financial performance, Defendant Freeborough added, in pertinent part:

> We finished the year producing just over 2 million ounces, in line with guidance, with 484,000 ounces produced in the fourth quarter. Cost of sales of $1,289 per ounce and all-in sustaining costs of $1,825 per ounce in the fourth quarter were higher compared to the prior quarter as expected due to higher gold prices and lower planned production related to mine sequencing. Full year cost of sales of $1,135 per ounce and full year all-in sustaining cost of $1,571 per ounce were in line with guidance despite the impact from higher royalties. Margins were strong at $2,847 per ounce sold in Q4 and $2,283 per ounce for the full year. Our adjusted earnings were $0.67 per share in Q4 and $1.84 per share for the full year.

> Adjusted operating cash flow was a record $1.1 billion in Q4 and a record $3.6 billion for the full year. Attributable CapEx was $362 million in Q4 and $1.18 billion for the full year, in line with our full year guidance. Attributable free cash flow was a record $769 million in Q4 and a record $2.5 billion for the full year.

26. Defendant Schimper then provided performance metrics for the relevant project sites. In pertinent part, he indicated performance at the Round Mountain, Nevada site had slowed as the transitional layback process, referred to as "Phase S," continues, pertinently providing the following:

> At Round Mountain, ***production of 32,000 ounces was lower compared to the prior quarter as Phase S continue to transition*** into initial ore while processing from lower grade stockpiles, resulting in a higher cost per ounce sold.

(Emphasis added).

27. Defendant Rollinson further commented on the company's guidance, reiterating the 2-million-ounce projection reaffirmed in the quarterly release, in pertinent part, as follows:

> With respect to our outlook, ***we are reaffirming our table multiyear production profile***. Production of 2 million ounces for '26 and '27 remains consistent with our previous guidance and we are introducing a new year of production of 2 million ounces for 2028. At which time, our new higher-grade U.S. projects are expected to come online coinciding with higher-grade mining at Tasiast. Together, we expect this will provide an organic offset to cost inflation through great enhancement within the mine plan.
>
> Looking further ahead, we expect production to remain around the 2 million-ounce level through the end of the decade, supported by the higher grade mining at Tasiast, the U.S. projects, open pit extensions at La Coipa and the start-up of Great Bear

(Emphasis added).

28. Defendant Freeborough was in accord, notably calling the company's ongoing 2-million-ounce annual projection a "stable . . . profile," in pertinent part:

> Turning to our guidance and outlook. We're ***forecasting production in the range of 2 million ounces for 2026 remaining consistent with previous guidance***. Production is expected to be relatively ***evenly split across the year*** at approximately 490,000 to 510,000 ounces each quarter. With respect to cost this year, we are guiding $1,360 per ounce for cost of sales and $1,730 per ounce for all-in sustaining costs at a gold price of $4,500 per ounce.
>
> . . .
>
> Looking ahead, our production guidance of 2 million ounces remains unchanged for 2027. And we have now added another year 2028 ***to our stable 2 million-ounce profile.***

(Emphasis added).

29. Defendant Dunford then took over the prepared remarks, discussing the Company's reserve and resource. In speaking to the alleged potential for the Rond Mountain site, Defendant Dunford provided the following, in pertinent part:

> ***At Round Mountain, the transition to underground replaced just over 1 million ounces of lower margin, lower grade open pit reserves with approximately 1.2 million ounces of higher grade, higher-margin underground reserves***, fully offsetting our depletion. ***We are pleased to continue to see this type of progress in our reserve base***, extending mine life as we advance exploration, optimizations and project studies across the portfolio.

(Emphasis added).

<u>*April 29, 2026*</u>

30. On April 29, 2026, after the market closed, the Company reported its first quarter 2026 results. In pertinent part, Kinross indicated production remained on track to meet full-year projections, stating:

> **2026 first-quarter highlights**:
>
> - **Production** of 492,563 gold equivalent ounces (Au eq. oz.).
> - **Production cost of sales** of $1,397 per Au eq. oz. sold and **attributable production cost of sales** of $1,380 per Au eq. oz. sold.

. . .

- **Reported earnings** of $843 million, or $0.70 per share, with **adjusted net earnings** of $854.1 million, or $0.71 per share.
- **On track to meet annual guidance:** On an attributable basis, Kinross expects to produce 2.0 million Au eq. oz. (+/- 5%) at a production cost of sales per Au eq. oz. sold of $1,360 (+/- 5%) and all-in sustaining cost of $1,730 (+/- 5%) per ounce sold for 2026. Total attributable capital expenditures are forecast to be $1,500 million (+/- 5%).

(Emphasis in original, footnotes omitted).

31. Defendant Rollinson reiterated much of the same during the earnings call the following morning, on April 30, 2026, stating, in pertinent part:

> Turning to our outlook. Following a strong first quarter, ***we are on track to achieve our production cost and capital guidance again this year***. More specifically on costs, given the recent geopolitical events, I would highlight that we continue to benefit from an attractive relative cost position, which is supported by our long-standing approach to mitigating cost pressures. This ***includes, among other things, our grade enhancement and hedging strategies.*** Andrea will comment on our hedge book strategy later.

(Emphasis added).

32. In pertinent part, Defendant Freeborough then discussed the Company's quarterly performance and the reaffirmed guidance, in pertinent part, as follows:

> Q1 was a strong start to the year for us. ***We produced 493,000 gold equivalent ounces as planned.*** Q1 cost of sales of $1,380 per ounce and all-in sustaining costs of $1,732 per ounce were also on plan. Margins were a record $3,476 per ounce and outpaced the increase in the gold price.
>
> Our adjusted earnings were $0.71 per share, and our adjusted operating cash flow was a record $1.1 billion.
>
> . . .
>
> Turning now to our guidance. Following Q1, ***we remain solidly on track to produce 2 million ounces at a cost of sales of $1,360 per ounce and all-in sustaining costs of $1,730 per ounce.*** And we are also on track with our capital guidance of $1.5 billion. As a reminder, our cost guidance was based on a $4,500 gold price and a $70 per barrel oil price.

> ***In terms of production, the second quarter is expected to be in line with our first quarter. As a result, the second half is expected to be slightly higher than the first half to meet our full year production guidance***. In terms of operating costs, we expect costs to be relatively stable throughout the year.

(Emphasis added).

33. Speaking specifically to the Round Mountain site, Defendant Schimper highlighted another sequential decline in production, stating, in pertinent part:

> At Round Mountain, ***production of 26,000 ounces was lower quarter-over-quarter due to the processing of lower grade, lower recovery stockpile feed as we continue to transition*** towards higher grade, higher recovery ore from Phase X in the second half of the year. Our cost of sales of $2,776 per ounce was higher due to the fewer ounces produced.

(Emphasis added).

34. During the question-and-answer segment, Defendant Schimper elaborated, assuring investors and analysts they were taking steps to "continue to optimize" the lower grade recovery as they transition through the end of Phase S during the following pertinent exchange:

> <Q: Ralph M. Profiti – Stifel Nicolaus Canada Inc. – Managing Director> Great. Yes, that's very helpful. And just as a sort of a minor follow-up. I'm looking at the Round Mountain recoveries for the quarter. I'm just wondering, is that sort of the normal grade and recovery relationship there? Was that expected? And is there any change in the metallurgical assumptions around sort of that Phase X underground transition when I think about those recoveries?
>
> <A: Claude J. S. Schimper> Yes, multiple parts to that. So first of all, when we feed from those stockpiles relative to where we are in the pit at the time, and this was -- the first quarter was really a lot of stockpile material. ***That grade is significantly lower and then the grade recovery curve***, as you know, changes. So ***we anticipated that sort of recovery***. ***We're doing a whole bunch of things to continue to optimize that.***
>
> And then Phase X is a different grade and completely different piece, very similar to what we had in Phase W or higher up in Phase W. So we do see

> that recovery changing as we put different types of material through for the year. And yes, it remains our focus point.

(Emphasis added).

35. Defendants fielded additional inquiries regarding Kinross' ability to achieve its projected guidance and continued to assure investors the slowdown was planned and that overall production remains on track, in pertinent part:

> <Q: Carey MacRury – Canaccord Genuity Corp. – Analyst of Metals and Mining> Congrats on the strong start. Just following up on the second half guidance being slightly higher than the first half. Just wondering what assets in particular we should be thinking about as stronger in the second half?
>
> <A: Andrea Susan Freeborough> Sure. I'll start and someone else may want to jump in. I think ***the U.S., in particular, we've pointed to as expected to be higher in the second half. Some of that is Round Mountain as we expect higher production*** as we get into the heart of Phase X.
>
> <A: J. Paul Rollinson> So ***we continue to be on plan at this point***.
>
> . . .
>
> <Q: Anita Soni – CIBC Capital Markets – Managing Director> . . . could you give us a little bit more guidance? Or is it the same as it was at the beginning of the year on the cadence of sustaining capital and growth capital spend over the next few quarters?
>
> <A: Andrea Susan Freeborough> Sure. I mean ***we were slower to start,*** which is typical for us. Q1 is always a bit of a lower CapEx quarter. So ***we're still on track for the full year*** with, in particular, the growth capital spending kind of ramping up on the U.S. projects as we go through the year.

(Emphasis added).

<u>*July 29, 2026*</u>

36. On July 29, 2026, Kinross published its second quarter results and again reaffirmed its annual guidance and reiterated that the Company remained "on track" to achieve it. In pertinent part, the release provided the following:

**2026 second-quarter highlights:**

- **Production1 of 492,326 gold equivalent ounces ("Au eq. oz.").**
- **Production cost of sales of $1,352 per Au eq. oz. sold and attributable production cost of sales of $1,336 per Au eq. oz. sold.**

. . .

- **Reported earnings** of $844.2 million, or $0.71 per share, with **adjusted net earnings** of $847.8 million, or $0.71 per share.
- **On track to meet annual guidance:** On an attributable basis, Kinross expects to produce 2.0 million Au eq. oz. (+/- 5%) at a production cost of sales per Au eq. oz. sold of $1,360 (+/- 5%) and all-in sustaining cost of $1,730 (+/- 5%) per ounce sold for 2026. Total attributable capital expenditures are forecast to be $1,500 million (+/- 5%).

(Emphasis in original, footnotes omitted).

37. Similarly, during the earnings call on July 30, 2026, Defendant Freeborough again assured investors the Company remained on track to achieve guidance and provided particularized production expectations for the third quarter to "remain in line" with the first two quarters, stating, in pertinent part:

> Turning now to our guidance. ***Following a strong first half, we remain solidly on track to deliver approximately 2 million ounces*** and a cost of sales of $1,360 per ounce and an all-in sustaining cost of $1,730 per ounce. And we're also on track with our capital guidance in the range of $1.5 billion. ***On production, we'd expect the third quarter to be in line with the first 2 quarters as we continue to transition to Phase S at Round Mountain***, and we expect the fourth quarter to be higher.

(Emphasis added).

38. Speaking to the quarterly results at the Round Mountain site in particular, Defendant Schimper highlighted and minimized risk stemming from the continued depreciation in quarter-over-quarter production during the Phase S transition, in pertinent part:

> Moving to our U.S. operations. ***Production was lower quarter-over-quarter as we ramp up ore mining at Round Mountain Phase S in the***

> ***second half of the year.*** Combined, the U.S. sites delivered production of 142,000 ounces, cost of sales of $1,871 per ounce . . . At Round Mountain, we are currently in a stage of higher waste mining and lower grade, lower volume ore supply as we are stripping Phase S. ***Higher grade, higher recovery ore is expected from Phase S in the second half of the year***.

(Emphasis added).

39. A question-and-answer segment followed, during which Defendant Schimper expanded on this projection and elaborate on the planned Round Mountain Phase S ramp in the back half of 2026 in the following pertinent exchange:

> <Q: Anita Soni – CIBC Capital Markets – Managing Director> I just wanted to get an idea about on Round Mountain, how we could see the back half of the year evolve?
>
> I think we look back to some -- when you were -- there was an update, I think, a couple of years ago about the Phase X, and I thought production was going to be somewhat in the like 150,000 to 200,000 ounces per year range this year, and it's kind of tracking a little bit behind. So are we looking for really strong grades in the back half of the year? Or was that kind of production profile shifted from -- understandably, from like 2 years ago from that chart?
>
> <A: Claude J. S. Schimper> Yes. I ***think for Round Mountain, the 150,000 forward has always been the target. We're obviously ramping up to that as we now are stripping into Phase S and getting into the ore in the second half of this year.*** When we add Phase X later, it will contribute as well and take it up to closer to the 200,000 range. So the 150,000 was always an average with a ramp-up period. So ***we do see increased production in the back end of this year as we now enter the Phase S ore and also getting into high-grade ore feed***. So during the first part of this year, we were doing a lot of -- production came from heaps and historical mining. ***So now we're moving to the ore in the back half of this year. So I do think we're targeting 120,000, 130,000 range for this year, and then it will build up into next year and years following.***
>
> <Q: Anita Soni> Okay. And then -- and sorry, just in terms of the types of grades that we could see from Phase S, is that kind of in the mid-1 grams? Is that what we should be seeing?
>
> <A: William D. Dunford> Yes. I think the average grade, I think we released it a couple of years ago, it was a little lower than 1 gram on average, I

> believe. But ***I think we have quite a bit of -- we're getting into 0.7 gram later in the phase. Deeper down, we get into the 1 gram stuff.***

(Emphasis added).

40. Defendant Dunford, speaking to the transition, noted that the Company had moved "ahead of schedule" on its progress to Phase X hitting first production in 2028, stating, in pertinent part:

> At Phase X at Round Mountain, ***underground development is progressing slightly ahead of schedule with over 8,400 meters completed to date, derisking our path to first production in 2028***. Engineering work for both surface and underground infrastructure is advancing well, including the start of detailed engineering for our paste backfill plant. Procurement is also advancing well with packages awarded for many critical items such as the mobile equipment, ventilation fans and the CRF plant. We've also had a strong focus on operations readiness, with 21 Kinross miners gaining experience, working underground with our contractor and onboarding of a highly experienced underground mine manager.

(Emphasis added).

41. Additionally, during the segment, Defendant Rollinson, in discussing the Tasiast gold mine project, spoke to the Company's efforts to expedite and layback projects. In pertinent part, Defendant Rollinson stated the following:

> I think piling on a bit, but it's all about, ***in a layback,*** as you can appreciate, Dan, ***we're just looking at the economies of scale and what we can do with perhaps bigger trucks, bigger shovels, truck optimization, what can we do to bring things forward in terms of waste removal***. That's where a lot of the analysis is right now. And in terms of ***what can we do to compress schedule on the amount of time it takes to do the layback***, that's where we're focused.

(Emphasis added).

42. Similarly, during the prepared remarks, Defendant Schimper briefly indicated the company had recently "optimized haul routes and truck dispatching practices" at the subject Round Mountain site, stating, in pertinent part:

> At both Round Mountain and Fort Knox, ***we have optimized haul routes and truck dispatching practices,*** reducing unnecessary engine hours and fuel consumption. These efforts have resulted in fuel savings of approximately 6.4 million liters while reducing haul cycle times at Fort Knox by approximately 7 minutes.
>
> At all of our sites, we are embracing the use of artificial intelligence and machine learning to improve our predictive maintenance, optimize schedules and mine planning and fire response management. Overall, our continuous improvement and innovation initiatives continue to generate measurable benefits across the portfolio, supporting safety, productivity gains, enhancing efficiency and helping offset inflationary cost pressures.

(Emphasis added).

43. Notably, neither the prepared remarks nor the follow-up discussions make explicit reference to the use or testing of larger vehicles at the Round Mountain facility or any potential risks such use could impose on Kinross' production guidance.

44. The above statements in Paragraphs 23 to 43 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected production outlook and anticipated growth while also minimizing risk from continued sequential production declines from Round Mountain Phase S. In truth, Kinross' repeated optimistic claims of a strong production ramp in the second half of 2026 sufficient to meet the attributable production guidance management had provided fell short of reality. The Company was simply not equipped to meet production benchmarks without slowing the rate of ore recovery.

***The Truth Emerges during Kinross' Mid-Quarter***

***"Operational and Return of Capital Update"***

*<u>September 23, 2026</u>*

45. On September 23, 2026, Kinross published a mid-quarter operational update. In the release, Kinross announced it would be sharply reducing its full-year

production projections as well as production guidance for the following 2027 fiscal year, in pertinent part, as follows:

> The Company now expects ***full-year 2026 and 2027 attributable production to be 2% to 3% below the low end of the previously disclosed guidance***, with ***approximately 1.84 to 1.86 million gold equivalent ounces ("Au eq. oz.") expected per year***.

(Emphasis added).

46. The release blamed the guidance reduction on issues "concentrated at two smaller assets, La Coipa and Round Mountain, and is the result of extreme weather and operational challenges," and elaborated on each, in pertinent part:

> At La Coipa, a series of unprecedented winter weather events throughout the third quarter disrupted mining and milling activities. Continuing weather impacts have resulted in lower than planned mining rates and mill throughput into September.
>
> The Company also saw higher than expected copper grades and lower than expected recoveries in some of the sulphide ore mined at La Coipa in the third quarter and ***has adjusted the production forecast for 2026 and 2027 to reflect lower recovery and stockpiling of some high copper material for potential future processing***.
>
> . . .
>
> At Round Mountain Phase S, ***lower mining rates and lower than expected grades and recoveries have reduced annual production expectations in 2026 and 2027***. The lower mining rates result in a deferral of higher-grade Phase S ore into future periods, while ***the lower mill grade and recoveries result in a loss of production versus prior estimates***. The operation is focused on implementing initiatives to improve the mill grade, recovery and mining rates.
>
> Phase S is being mined as a bridge to longer-term operations at Phase X underground. Grades, recoveries and production are expected to improve as the Phase X underground ramps up and higher-grade ore is blended with Phase S ore. The Company has recently seen positive results from infill drilling at Phase X indicating higher ounces than expected in the early stoping horizons. Phase X remains on track and is expected to contribute production as planned in 2028.

(Emphasis added).

47. On September 29, 2026, Defendant Rollinson presented on behalf of the Company during the Mining Forum Americas 2026. During an interview, he elaborated on the ore recovery challenges to Round Mountain Phase S, clarifying the Company believed the dilution was at least partly "operational" and seemingly caused by Kinross' use of oversized machinery:

> ***Where we have the challenges*** is really in the bridge, the bridge to Phase X and what ***we call Phase S, which is a layback in the south***. As we've been going through Phase S, we've just encountered some challenges in recoveries and grade. We see the grade in the rock. It hasn't reported to the mill. I would characterize these as sort of operational, and we're going to tune those in. Recoveries are coming up.
>
> ***We do believe that maybe part of this was all related to some dilution***. What we have done is taken the decision to ***reduce the size of the fleet. We've gone from bigger shovels to smaller shovels***. That allows us to do more selective mining, less dilution. That's preserving gold. The converse of that, of course, is ***it slows down our mining rate***. Think about it as a deferral as opposed to a loss. That's Round Mountain Phase S transition on the way to X underground.

(Emphasis added).

48. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made in the above-referenced releases and associated shareholder calls. In those publications, Defendants repeatedly reiterated their guidance and reaffirmed that they remained "solidly on track" to achieve annualized production of 2 million Au eq. oz. for each of the fiscal years 2026 through 2028, while continually minimizing the risks associated with declining production at Round Mountain. Instead, Defendants repeatedly and confidently assured investors that production would significantly ramp in the back half of the year to meet guidance thresholds.

49. Investors and analysts reacted immediately to Kinross' revelation. The price of Kinross' common stock declined dramatically. From a closing market price of $27.62 per share on September 23, 2026, Kinross' stock price fell to $24.42 per share on September 24, 2026, a decline of about 11.585% in the span of just a single day.

50. A number of well-known analysts who had been following Kinross lowered their price targets in response to Kinross' disclosures. For example, Jefferies, while cutting its price target around 7.9%, highlighted Kinross' guidance reduction as follows:

> KGC now expects 2026 & 2027 production of 1.84-1.86Moz, 2-3% below low end of prior guidance and 8% and 7% below our est and cons at the midpoint, driven by weather and recovery issues at LaCoipa and lower mining rates, grades, and recoveries at Round Mountain.

51. In pertinent part, the analyst continued summarizing the Round Mountain Phase S issues as follows:

> Recovery issues persisted into 3Q26, compounded by operator availability, lower mining rates, and geotechnical challenges at Phase S. Mine-to-mill reconciliation points to ore loss and dilution rather than a material block issue . . . The focus appears to be improving ore delivery and recoveries while keeping Phase X on schedule.

52. Additionally, Desjardins, while lowering their price target a similar 8.6% promptly highlighted Kinross' production guidance, noting it was "7-10% below our prior estimates, and 8-9% below consensus." Desjardins similarly highlighted that "lower Phase S mining rates defer higher grade ore, and weaker feed grade and recoveries result in a loss of ounces."

53. CIBC also cut their price target after "updating [their] model to reflect KGC's guidance … to $50.00 from $54.00," a decline of about 7.4%. The analyst pointed to the production deferral at Round Mountain, noting that the "[l]ower mining rates, grades, and

recoveries at Phase S have resulted in 100kozpa production impact in both 2026 and 2027."

54. The fact that these analysts, and others, discussed Kinross' shortfall and below-expectation projections suggests the public placed significant weight on Kinross' production estimates. The frequent, in-depth discussion of Kinross' guidance confirms that Defendants' statements during the Class Period were material.

***Additional Scienter Allegations***

55. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Kinross were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the potential near-term and overall output of Round Mountain Phase S, as well as the methods and machinery used to facilitate the mining process.

56. Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Kinross was "on track" to achieve the guidance and that production was progressing "as planned."

57. Indeed, despite acknowledging they were "slower to start" after the first quarter, Defendants continued to reaffirm their annual production guidance. While Round Mountain Phase S continued to demonstrate successive quarterly production declines, Defendant Freeborough assured investors they remained "solidly on track."

58. Defendants' scienter was further evidenced when Defendant Rollinson disclosed on July 30, 2026, that the Company was "looking" into "economies of scale"

and what the Company "can do" with "bigger trucks, bigger shovels" to "compress schedule on the amount of time it takes to do the layback."

59. In reality, however, Kinross was already seemingly using bigger tools at Round Mountain for Phase S. Defendant Rollinson acknowledged, on September 29, 2026, that Kinross would be shifting to smaller tools at Round Mountain, believing the use of a larger fleet with "bigger shovels" caused "some dilution." Defendant Rollinson further admitted that the use of smaller tools "slows down our mining rate," but would cause "less dilution" and would be "preserving gold." Conversely, the larger tools could speed up the mining rate but would come with the caveat of an increased risk of dilution and reduce the rate of gold recovery.

60. Yet, Defendants never informed investors that they would be utilizing machinery which carried a greater dilution risk at the Round Mountain mine. Defendants further did not appropriately caution investors that Phase S may need to slow down and utilize more careful mining measures in order to achieve production benchmarks.

61. They did, however, tout that Round Mountain's Phase X had begun "progressing slightly ahead of schedule" by the end of the second quarter, while Phase S was showing sequential production declines.

***Loss Causation and Economic Loss***

62. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Kinross' common stock and operated as a fraud or deceit on Class Period purchasers of Kinross' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and

fraudulent conduct became apparent to the market, the price of Kinross' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Kinross' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

63. Kinross' stock price fell in response to the corrective event on September 23, 2026, as alleged *supra*. On September 23, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Kinross' forecasting processes and growth guidance.

64. In particular, on September 23, 2026, Kinross announced significantly below-market growth expectations, considerably reducing their own prior production guidance for each of the fiscal years 2026 and 2027.

***Presumption of Reliance; Fraud-On-The-Market***

65. At all relevant times, the market for Kinross' common stock was an efficient market for the following reasons, among others:

(a) Kinross' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b) Kinross communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Kinross was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Kinross was reflected in and incorporated into the Company's stock price during the Class Period.

66. As a result of the foregoing, the market for Kinross' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Kinross' stock price. Under these circumstances, all purchasers of Kinross' common stock during the Class Period suffered similar injury through their purchase of Kinross' common stock at artificially inflated prices, and a presumption of reliance applies.

67. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

***No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine***

68. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from

the fact that they provided investors with production projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in ore recovery and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

69. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

70. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Kinross who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**CLASS ACTION ALLEGATIONS**

71. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Kinross' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

72. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kinross' common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Kinross or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of September 30, 2026, there were approximately 1.178 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

73. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

75. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Kinross;

(c) whether the Individual Defendants caused Kinross to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Kinross' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

76. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

***Against All Defendants for Violations of***

***Section 10(b) and Rule 10b-5 Promulgated Thereunder***

77. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kinross common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Kinross' securities at artificially inflated prices. In furtherance of this

unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

80. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Kinross' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

81. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

82. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Kinross' internal affairs.

83. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kinross' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Kinross' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Kinross' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

84. During the Class Period, Kinross' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kinross' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true

value of Kinross' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Kinross' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company would not be able to meet its production guidance due to in part operational issues which negatively impacted the rate of ore recovery.

## COUNT II

***Against the Individual Defendants***

***for Violations of Section 20(a) of the Exchange Act***

87. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Kinross' misstatements.

89. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Kinross which had become materially false or misleading.

90. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kinross disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kinross to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kinross' common stock.

91. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Kinross to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92. By reason of the above conduct, the Individual Defendants and/or Kinross are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 6, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*